IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ECOLOGY SERVICES, INC.,

            Plaintiff,

            v.

GRANTURK EQUIPMENT, INC.,

            Defendant,

and

G&H MANUFACTURING, LTD.

            Defendant.

\*   CIVIL NO. RDB-04-2631

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

      Pending before this Court is the Motion to Dismiss for Lack of Subject Matter

Jurisdiction filed by Defendant GranTurk Equipment, Inc. ("GranTurk") on December 12, 2005

and the Motion for Summary Judgment filed by GranTurk on March 10, 2006.  On August 12,

2004, Plaintiff Ecology Services, Inc. ("ESI"), a waste hauling company, filed a four-count

Complaint in this Court against GranTurk and G&H Manufacturing alleging, *inter alia*, breach

of contract.  The contract at issue relates to the assembly and delivery of garbage trucks.

GranTurk sells rear loaders and G&H Manufacturing, Ltd. ("G&H") is a manufacturer of rear

loaders.

      On January 27, 2005, this Court issued a Memorandum Opinion and Order denying the

Motion to Dismiss filed by G&H.  On April 28, 2005, G&H filed a suggestion of bankruptcy and

on the same day this Court entered an Order staying this action against G&H pending disposition

of the bankruptcy proceedings against it.  Accordingly, because this matter remains pending in

the bankruptcy court, G&H has not responded to the currently pending motions.  Plaintiff ESI,

however, has filed an opposition to both of GranTurk's Motions, which are now fully briefed.

The parties' submissions have been reviewed and no hearing is necessary.  *See* Local Rule 105.6

(D. Md. 2004).  For the reasons that follow, GranTurk's Motion to Dismiss is DENIED and

GranTurk's Motion for Summary Judgment is GRANTED in part and DENIED in part.

BACKGROUND

In its Complaint, Plaintiff alleges that it entered into a contract, entitled "Order Form"

with GranTurk on November 25, 2003, whereby it agreed to purchase 12 G&H R-90 30 Yard,

60/40 Split Rear Loaders (the "Bodies") from GranTurk.  (Compl. ¶ 9.)  GranTurk also allegedly

agreed to install, or cause to be installed, the Bodies onto truck chassis that ESI was going to

supply.  (*See id.*)  Plaintiff contends that GranTurk contracted with G&H for the Bodies.

(Compl. ¶ 12.)  The contract was allegedly modified on December 1, 2003 to include a delivery

deadline for the garbage trucks and a late penalty of $100 per truck, per day.  (Compl. ¶ 12.)  ESI

alleges that under the modified agreement GranTurk agreed to deliver six garbage trucks to ESI

before April 15, 2004 and the remaining six before May 15, 2004.  (*See id.*)  As discussed in

more detail below, at the time the Complaint was filed, three trucks had yet to be delivered.

After discovery, the parties presented the following facts which are not in dispute.  ESI

entered into a contract in late 2002 with Montgomery County, Maryland for refuse removal

services.  (*See* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. at Ex. 1, Dep. of Dennis Holt at 22.)  On a

2

GranTurk "Order Form" dated November 25, 2003, GranTurk agreed to sell ESI 12 G&H R-90, 60/40 Split Rear Loaders to be installed on ESI's chassis.  (*See* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. at Ex. 3.)  The cost of each truck with these specifications was noted as $77,675.13. (*See id.*)[1]  The Order Form states: "Title to the item described herein shall at all times remain with GranTurk Equipment Co. Inc., until all contingencies and terms set forth herein have been fully satisfied.  Delivery promised subject to delay beyond our control:".  (*Id.*)  Although this clause ends with a ":" there was nothing written in a blank space after this provision.  The Order Form provides, in bold writing, that "[i]n the event of price or specification change, prior to shipment, either party may cancel this Contract without penalty."  (*Id.*)  Lastly, the Order Form states: "Both parties agree that this Contract supersedes all previous Agreements, and that all conditions and terms of the Agreement are set forth herein in writing, and that any modification to this Agreement must be in writing and duly accepted by both parties."  (*Id.*)  Scott Schneider signed the Order Form on behalf of GranTurk and Timothy Osborne signed as President of ESI. (*See id.*)

        The events surrounding the actual sign-off of this Order Form and each side's agreement to certain purported terms outside of the Order Form dated November 25, 2003 are muddled at best.  There is a dispute as to when the contract was formed.  In particular, there is a material fact in dispute concerning when the parties signed the Order Form and what information was known to the signatories at that time.  ESI contends that Schneider came to ESI on or about December 1, 2003 to present ESI with a printout of an e-mail from Brad Forehand, an employee of G&H, to Scott Schneider establishing delivery dates and delay damages that G&H was willing to provide

---

[1]        The Order Form notes that "[t]otal due at time of delivery."  (*See id.*)

GranTurk.[2]  ESI contends that it was not until after this e-mail was presented that the parties

signed the Order Form.[3]  ESI notes that it alleged in its Complaint that the contract was entered

into on November 25, 2003 with a modification on December 1, 2003, but it now claims post-

discovery that the parties entered into the contract on December 1, 2003.[4]  Although the Order

Form is dated November 25, 2003 at the top of the document, there is no indication next to either

Osborne's or Schneider's signature noting a date.  In his deposition, Scott Schneider seems to

indicate that nothing was signed until after November 25, 2003 and that the "proposal was

signed, probably on 12/1."  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. at Ex. 2, Dep. of Scott

Schneider at 49:10-14.)  As previously noted, the only date on the Order Form is November 25,

2003 and that is the date that GranTurk refers to as the contract date.

    The"e-mail" from Forehand of G&H to Schneider of GranTurk notes, in part, that:

> Per our conversation, G&H agrees to deliver (12) completed units to
> GranTurk.  The first (6) units shall be delivered to Granturk
> Baltimore on or before April 15th provided suitable chassis arrive
> prior to March 15th and the last (6) units on or before May 15th

---

[2]     ESI cites the Deposition of Scott Schneider at p. 63, lines 2-10 in support of this
statement.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. at Ex. 2.)  This portion of Schneider's
Deposition is discussing a deposition exhibit (not before this Court by the same exhibit number)
that is not clearly identified in the deposition as an e-mail from Forehand to Schneider.
Although the Deposition notes a document dated December 1, 2003, the e-mail to which ESI
appears to be referring to, attached as Exhibit 4 to its Opposition, is not dated.  Nor does the "e-
mail", which is unaccompanied by an authenticating affidavit, bear the customary formatting of a
printed e-mail message, indicating the sender, recipient, date, and subject.

[3]     ESI cites the Deposition of Scott Schneider at p. 65-66 in support of this
statement.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. at Ex. 2.)  However, the Court cannot
decipher, with any real certainty, the documents that are being referred to in the deposition,
which seem to contain multiple pages.  The Order Form at issue appears to be only one page in
length.

[4]     Although ESI notes in its response in opposition that it will seek to amend its
Complaint to reflect the new contract date, no such motion to amend has been filed.

provided suitable chassis arrive before April 15th.

We will stand behind a $100 per day late penalty clause.

(Pl.'s Mem. Opp. Def.'s Mot. Summ. J. at Ex. 4.)  ESI contends that this e-mail is part of the

contract.  GranTurk contends that there is no provision for delivery dates or late penalties in the

contract between GranTurk and ESI for G&H manufactured bodies.  GranTurk does, however,

agree that there was an "understanding" between the GranTurk and ESI concerning delivery

dates for the garbage trucks covered by this contract.  (*See* Def.'s Mem. Supp. Mot. Summ. J. at

n.11.) This understanding, it concedes, was reached outside of the Order Form or above

referenced e-mail.  (*See id.*)

There is also confusion surrounding which contract was impacted by a fax cover sheet

sent by Scott Schneider to ESI on which GranTurk does not dispute that it agreed to pay late

fees.  (*See* Def.'s Mem. Supp. Mot. Summ. J. at Ex. at 13.)  GranTurk highlights that ESI and

GranTurk entered into another contract on November 25, 2003.  (*See* Def.'s Mem. Supp. Mot.

Summ. J. at Ex. 5.)  This other Order Form was for assembly of 8 garbage trucks using Leach

manufactured truck bodies.  (*See id.*)  The contract concerning the G&H bodies was for 12

garbage trucks.  GranTurk contends that the late payments that it agreed to were for the Leach

manufactured truck bodies, which were delivered on time.  (Def.'s Mem. Supp. Mot. Summ. J. at

Ex. 6, Dep. of Timothy Osborne at p. 24.)  GranTurk has forecast evidence that Scott Schneider,

who signed the fax cover sheet, stated that those delivery dates and late fees were for the Leach

truck bodies.  (Def.'s Mem. Supp. Mot. Summ. J. at Ex. 4, Dep. of Scott Schneider at pp.45-46.)[5]

---

[5]  This Court notes that p.46 of Scott Schneider's deposition is missing from the Court's
copy of Defendant's Motion for Summary Judgment.  However, the Court accepts counsel's
representation of the answer to the question posed at line 21 on p. 55.

The parties also do not concur on how many of the garbage trucks with G&H bodies were delivered late.  In its Complaint, ESI claims that GranTurk breached its contract with ESI by "failing to deliver all of the Garbage Trucks as set forth herein."  (Compl. ¶ 20.)  According to Plaintiff's answer to Defendant's Interrogatory Number 7, none of the 12 garbage trucks had been delivered as of the earliest deadline, April 15, 2004, three garbage trucks were delivered by the final deadline of May 15, 2004, and the remaining nine trucks were delivered after May 15, 2004.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 8, Pl.'s Ans. to Interrogatory No. 7. p. 9.)  Moreover, in its June 21, 2004 Demand Letter to Granturk, ESI expressed concern over GranTurk's "ability to deliver due to the excessive delays."  (Def.'s Mot. Summ. J. Ex. 16, ESI Demand Letter to Granturk.)

GranTurk appears to challenge Plaintiff's allegation that all twelve garbage trucks were delivered late by asserting that the original contract did not specify delivery dates, yet, as previously noted, GranTurk "does not contest the substance of [the] understanding concerning delivery dates."  (Def.'s Mem. Supp. Mot. Summ. J. p. 3; *see also Id*. at p. 15 n.11.)  Nevertheless, GranTurk highlights the fact that all but three garbage trucks had been delivered as of the filing of Plaintiff's Complaint, August 12, 2004, almost three months after the final deadline.  (*See* Def.'s Mem. Supp. Mot. Summ. J. p. 4.)  Plaintiff asserts, however, that "GranTurk does not dispute that at least the majority of the Garbage Trucks were delivered late."  (Pl.'s Opp. Def.'s Mot. Summ. J. p. 3.)

## STANDARDS OF REVIEW

I.     Motion to Dismiss

Defendant seeks to dismiss Plaintiff's action for lack of subject matter jurisdiction.

Motions to dismiss for lack of subject matter jurisdiction are decided under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  "The plaintiff bears the burden of proving that subject matter jurisdiction properly exists in the federal court."  *Biktasheva v. Red Square Sports, Inc.*, 366 F. Supp. 2d 289, 294 (D. Md. 2005).  The court may "consider evidence outside the pleadings" in a 12(b)(1) motion to determine if it has jurisdiction over the case.  *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).  "The court should grant the 12(b)(1) motion only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Biktasheva*, 366 F. Supp. 2d at 294 (quoting *Richmond*, 945 F.2d at 768).

Plaintiff claims that this Court has jurisdiction over this case as a diversity suit under 28 U.S.C. § 1332.  Federal district courts "have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000" and is between citizens of different states.  28 U.S.C. § 1332.  The United States Court of Appeals for the Fourth Circuit, in *Shanaghan v. Cahill*, 58 F.3d 106 (4th Cir. 1995), set forth the test district courts should utilize when the amount in controversy alleged by a plaintiff is challenged:

> First, the court should look to the face of the complaint itself to determine whether it is a legal certainty that plaintiff's claims do not reach the required amount.  Unless the claim for an amount over the jurisdictional prerequisite is made in bad faith, or unless it is plain from the complaint that an amount less than the jurisdictional amount is all that is at issue, the district court has jurisdiction over the case. . . . Second, if some event subsequent to the complaint reduces the amount in controversy, . . . the court must then decide in its discretion whether to retain jurisdiction over the remainder of the case.

*Id*. at 112. (internal citations omitted).

In exercising its discretion to determine whether to retain jurisdiction when the amount in controversy falls below $75,000, a district court should consider five factors:

(1) an evaluation of the convenience and fairness to both parties if the case is kept or dismissed, taking into consideration the interests of judicial economy; (2) whether the amount claimed in the complaint was made in good faith, or whether the plaintiff was consciously relying on flimsy grounds to file in federal court; (3) whether the state statute of limitations would bar refiling the action in state court if dismissed; (4) the amount of time and energy that the federal court already has expended in connection with the case, and whether it might be more efficient to just keep it; (5) whether the case presents some significant issue of state law best decided in state court.

*Peiffer v. King Pontiac Buick GMC, Inc*., 105 F. Supp. 2d 470, 472-73 (4th Cir. 2000) (citing

*Shanaghan*, 58 F.3d at 112).

II      Summary Judgment

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold*, Inc., 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  However, the opponent must bring forth evidence upon which a

reasonable fact-finder could rely.  *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  "Once the movant has established the absence of any genuine issue of material fact, the opposing party has an obligation to present some type of evidence to the court demonstrating the existence of an issue of fact."  *Pension Ben. Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005) (citing *Pine Ridge Coal Co. v. Local 8377, UMW,* 187 F.3d 415, 422 (4th Cir. 1999)).  Rule 56(e) also requires that "affidavits submitted by the party defending against a summary-judgment motion contain specific facts, admissible in evidence, from an affiant competent to testify, 'showing that there is a genuine issue for trial.'"  *Id.* (quoting 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2740, 399 (3d ed. 1998)).  The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment.  *Anderson*, 477 U.S. at 252.

<u>DISCUSSION</u>

I.     <u>Subject Matter Jurisdiction under 28 U.S.C. § 1332</u>

Plaintiff claims it has shown that this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, by establishing diversity of citizenship of the parties and meeting the jurisdictional amount in controversy.  Defendant argues that Plaintiff has failed to meet the jurisdictional amount of $75,000, and alternatively, that even if the jurisdictional amount has been met, the Court should use its discretion to decline to retain jurisdiction in this case.  Under *Shanaghan* this Court will, first, examine the "face of the complaint itself to determine whether it is a legal certainty that plaintiff's claims do not reach the required amount."  *Shanaghan v. Cahill*, 58 F.3d 106, 112 (4th Cir. 1995).

Plaintiff's Complaint alleges that "[t]he amount in controversy exceeds $75,000,

exclusive of interest, costs and attorneys' fees." (Compl. ¶ 6.)  The Complaint contains the

following causes of action: Count I (Specific Performance); Count II (Delay Damages Against

GranTurk); Count III (Delay Damages against G&H); and Count IV (Compensatory Damages

for Breach of Contract).  Plaintiff alleges that it entered into a contract, entitled "Order Form"

with GranTurk on November 25, 2003, whereby it agreed to purchase 12 G&H R-90 30 Yard,

60/40 Split Rear Loaders from GranTurk.  (Compl. ¶ 9.)[6]  The contract was allegedly modified

on December 1, 2003 to include a delivery deadline for the garbage trucks.  (Compl. ¶ 12.)  ESI

alleges that under the modified agreement GranTurk agreed to deliver six garbage trucks to ESI

before April 15, 2004 and the remaining six before May 15, 2004.  (*See id.*)

Plaintiff alleges that the modified agreement included a penalty of $100 per day, per

truck, for late delivery.  (*See id.*)  As of the time Plaintiff filed its Complaint, on August 12,

2004, three garbage trucks were yet to be delivered.  (Compl. ¶ 12.)  The Complaint alleges

delay damages against GranTurk and G&H in the amount of $21,900 as of June 21, 2004 and

alleges that damages will continue to accrue until the missing garbage trucks are delivered to

ESI.  (Compl.  ¶¶ 23, 25, 30, 31.)  Plaintiff also alleges that the Bodies were patented by G&H

and that no adequate substitute for the bodies exists.  (Compl. ¶¶ 18 & 19.)  Count IV alleges

that "[t]he failure of GranTurk to timely deliver the Garbage Trucks has proximately caused

injury to ESI in the amount of $500,000."  (Compl. ¶ 34.)   Indeed, the "face of the complaint

itself" does not illustrate that it is a "legal certainty that plaintiff's claims do not reach the

required amount."  *Shanaghan*, 58 F.3d at 112.

---

[6]        GranTurk also allegedly agreed to install, or cause to be installed, the Bodies onto
truck chassis that ESI was going to supply.  (*See id.*)  Plaintiff contends that GranTurk contracted
with G&H to have the Bodies installed onto the chassis.  (Compl. ¶ 12.)

GranTurk notes the Supreme Court's decision in *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283 (1938) to support its argument that dismissal is nonetheless appropriate in this case.  The Supreme Court in *St. Paul Mercury* stated:

> But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed. Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction.

*Id.* at 289-290.  GranTurk argues that subsequent proofs illustrate that ESI was never entitled to recover the amount claimed in its Complaint and, therefore, Plaintiff's Complaint should be dismissed.  It is undisputed that three of the garbage trucks had not been delivered at the time the Complaint was filed.  Furthermore, ESI contends that it was uncertain, at the time the Complaint was filed, whether it would ever get delivery of the three garbage trucks for which it had prepaid. ESI claims that each of the Bodies cost $77,675.13.  (*See* Compl. Ex. 1.)  In addition, the three chassis to which the Bodies were to be attached cost $99,000.  (*See* Compl. Ex. 2.)  Therefore, at the time the Complaint was filed, ESI was waiting to receive three garbage trucks.  Each garbage truck was worth in excess of $175,000, for a total of about $525,000 worth of equipment in GranTurk's possession for which ESI had paid.  Although all the garbage trucks were delivered by September 28, 2004, Plaintiff correctly notes that if these trucks had not been delivered subsequent to the filing of the Complaint, ESI would certainly have a claim with an amount in controversy exceeding $75,000.

Even assuming that subsequent events -- the delivery of the garbage trucks -- decreased the amount in controversy below the jurisdictional prerequisite of $75,000, application of factors

11

outlined in *Shanaghan* indicate that it is appropriate for this Court to retain jurisdiction over this case. *See Peiffer v. King Pontiac Buick GMC, Inc.*, 105 F. Supp. 2d 470, 472-73 (4th Cir. 2000) (citing *Shanaghan*, 58 F.3d at 112) (outlining the factors for a district court to consider to determine whether to retain jurisdiction when the amount in controversy falls below $75,000). First, fairness to the parties and judicial economy favor this Court retaining jurisdiction, as the parties have fully briefed summary judgment in this case. Second, this Court does not find that the amount claimed in the Complaint was made in bad faith. Third, even though it appears that the statute of limitations does not prohibit Plaintiff from filing this action in state court, this factor alone does not necessitate this Court declining to exercise jurisdiction in this case. Fourth, this Court has already expended energy in connection with this case, having already ruled on one other pre-trial motion.[7] Fifth, although this case presents issues of state contract law, it does not appear that the issues are particularly significant. Therefore, this Court is equipped to address the substantive state law questions at issue. After weighing the *Shanaghan* factors, this Court, in the exercise of its discretion, will retain jurisdiction in this case, even assuming that subsequent events have reduced the amount in controversy below $75,000. *See Shanaghan*, 58 F.3d at 112.

II.   <u>Summary Judgment</u>

As previously outlined, ESI's Complaint contains the following causes of action: Count I (Specific Performance); Count II (Delay Damages Against GranTurk); Count III (Delay Damages against G&H); and Count IV (Compensatory Damages for Breach of Contract)[8].

---

[7]     In addition, Magistrate Judge James Bredar spent considerable time on this case in an effort to facilitate a settlement.

[8]     Count IV names only GranTurk as a Defendant.

Count I is moot, as the requested relief – an Order from this Court for Defendants to deliver the missing garbage trucks – has already taken place as it is undisputed that all the garbage trucks have been delivered to ESI.  Furthermore, as noted above, this action is stayed as to G&H and, therefore, Count III, seeking delay damages from G&H, is stayed pending the resolution of G&H's bankruptcy proceeding.

As a result, the remaining counts for this Court to address on summary judgment are Count II and Count IV.  GranTurk moves for summary judgment based on two main arguments.  First, GranTurk contends that late delivery was excused because of a steel shortage.  Second, GranTurk argues that it did not agree to any late payment penalty and that such a "penalty" is unenforceable under both the Uniform Commercial Code ("U.C.C.") and Maryland law.  First, ESI opposes GranTurk's motion contending that GranTurk has offered no facts, let alone undisputed facts, to support its impossibility defense based on a steel shortage.  Second, ESI opposes GranTurk's motion noting that there is a material fact in dispute as to the terms of the contract because ESI believes that the e-mail noting delivery dates and penalty provisions was part of the"original contract" between ESI and GranTurk.  (Pl.'s Mem. Supp. Opp. Summ. J. p. 6.)  Both parties apply Maryland law to this breach of contract action.[9]  This Court, sitting in diversity, will apply Maryland contract law and the U.C.C., as adopted by Maryland, in deciding this breach of contract dispute.

---

[9]     Under Maryland choice of law principles, the "place of contracting" or *lex loci contractus* determines which state law to apply.  *See Rouse Co. v. Federal Ins. Co.*, 991 F. Supp. 460 (D. Md. 1998) (citing *American Motorists Ins. Co. v. ARTRA Group, Inc.,* 338 Md. 560, 659 A.2d 1295 (1995)).  "Under the *lex loci* principle, a contract is 'made' where the last act necessary for its formation is performed."  *Id.* (citing *Grain Dealers Mut. Ins. Co. v. Van Buskirk,* 241 Md. 58, 215 A.2d 467 (1965)).

A.    Defendant's Assertion that it is Excused from Late Performance Under the
      Impracticability Defense

GranTurk argues that any failure to timely deliver trucks to Plaintiff is excused by the

doctrine of impracticality, as codified in MD. CODE ANN., COM. LAW § 2-615.[10]  Specifically,

GranTurk contends that the "alleged late delivery of some of the trucks was due to

impracticability of performance caused by steel shortages experienced by G&H, the contract's

sole source of supply for the truck bodies and timely delivery was, therefore excused."  (Def.'s

Mem. Supp. Mot. Summ. J. p. 7.)  In response, ESI contends that GranTurk is not entitled to

summary judgment on its impracticability defense and argues that GranTurk has "not recited any

facts, much less undisputed fact, to support this heavily fact dependent defense."  (Pl.'s Mem.

Opp. Def.'s Mot. Summ. J. p. 4.)

Section 2-615 applies when "a particular source of supply is exclusive under" a contract,

*see* MD CODE, COM. LAW § 2-615 comment 5, and reads in pertinent part:

> Delay in delivery or nondelivery in whole or in part by a seller . . . is
> not a breach of his duty under a contract for sale if performance as
> agreed has been made impracticable by the occurrence of a
> contingency the nonoccurrence of which was a basic assumption on
> which the contract was made or by compliance in good faith with any
> applicable foreign or domestic governmental regulation or order
> whether or not it later proves to be invalid.

MD CODE, COM. LAW § 2-615.  This Court in *Rockland Indus., Inc. v. E+E (US) Inc.*, 991 F.

Supp. 468 (D. Md. 1998), *on reconsideration in part*, 1 F. Supp. 2d 528 (D. Md. 1998), applying

---

[10]    GranTurk, while including 15 affirmative defenses in its Answer, did not list the
defense of impracticability.  *See generally Rockland Indus., Inc. v. E+E (US) Inc.*, 991 F. Supp.
468, 470 (D. Md. 1998), *on reconsideration in part*, 1 F. Supp. 2d 528 (D. Md. 1998) (referring
to the defense of impracticability as an affirmative defense); Fed. R. Civ. P. 8(c).  However, this
Court will address GranTurk's defense.

Maryland law, adopted the following strict requirements for the availability of the "sole source" excuse:

> [T]he source of supply must not only fail, it must have (1) been mutually contemplated by the parties as the sole source of supply, (2) *the failure must not have been foreseeable at the time of the contracting* and (3) the party seeking to be excused must have employed "all due measures" to insure that the source did not fail.

*Id*. at 471 (quoting 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 3-10(c), at 175-76 (4th ed. 1995)) (emphasis added in *Rockland*).[11]

In determining if a business should be relieved of its contractual duties for impracticability, a court must consider "[c]ircumstances existing at the contracting date and foreseeability."  *Heat Exchangers, Inc. v. Map Constr. Corp.*, 34 Md. App. 679, 688, 368 A.2d 1088, 1093 (Md. Ct. Spec. App. 1977); *see also Rockland*, 991 F. Supp. at 472 ("Foreseeability is the key in commercial impracticality cases.").  Furthermore, "where there is an agreed sole source and it is foreseeable that the sole source may fail, the risk of nondelivery is on the seller unless the seller includes exculpatory language thereby expressly transferring the risk to the purchaser." *Rockland Indus., Inc. v. E+E (US) Inc.*, 1 F. Supp. 2d 528, 531 (D. Md. 1998) (citing

---

[11]    *Rockland* recognized as support for its adoption of the White and Summers test, the analysis employed by Maryland courts for a § 2-615 defense:

> (1) a contingency must occur (2) performance must thereby be made "impracticable" and (3) the non-occurrence of the contingency must have been a basic assumption on which the contract was made.

*Rockland*, 991 F. Supp. at 472 (quoting *Heat Exchangers, Inc. v. Map Constr. Corp.*, 34 Md. App. 679, 684, 368 A.2d 1088, 1091 (Md. Ct. Spec. App. 1977)).  ESI correctly notes that GranTurk has not provided sufficient evidence, or documentation of any kind, of the steel shortage or its alleged impact on G&H's ability to timely deliver truck bodies to satisfy prongs one or two of this test under the summary judgment standard.  (*See* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. p. 5-6.)

*Rockland,* 991 F. Supp. at 470-73).

Applying the *Rockland* test to the facts of this case, the parties do not dispute that the first prong—that both parties mutually contemplated G&H as the sole source of the truck bodies—is satisfied.  GranTurk asserts in its Motion for Summary Judgment that both parties agreed that G&H would be GranTurk's sole source for the truck bodies at issue in the contract that is the subject of this lawsuit.  (*See* Def.'s Mem. Supp. Mot. Summ. J. p. 11.)  ESI does not contest that G&H was to be GranTurk's sole source of these truck bodies.  (*See generally* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. p. 1.)  Therefore, the first prong is satisfied.

This Court cannot, however, conclude on the record before it that there are no material facts in dispute under the second and third prongs of the *Rockland* test.  With respect to the second prong—that the failure must not have been foreseeable at the time of the contracting—there is a genuine dispute regarding the foreseeability of the alleged steel shortage that GranTurk cites as the source of G&H's failure to timely supply the truck bodies.  GranTurk contends that neither party foresaw the steel shortage, quoting deposition testimony by ESI's CEO, Timothy Osborne, that he did not foresee the national steel shortage.  (*See* Def.'s Mem. Supp. Mot. Summ. J. p. 12.)  Although the quoted deposition testimony of ESI's CEO shows that *he* did not foresee the steel shortage, that testimony does not demonstrate that the steel shortage was not *foreseeable* (by *either* party) at the time of contracting.[12]  GranTurk has provided no

---

[12]     Indeed, at least one court has noted that there was a shortage of steel in 2003-2004 but found that the shortage was foreseeable.  *See Chainworks, Inc., v. Webco Indus., Inc.*, 2006 WL 461251 (W.D. Mich. 2006) (referring to, *inter alia*, news articles describing "the historical volatility of the steel market as far back as 1995:  According to the articles, steel pricing has fluctuated throughout the late 1990's and into 2003.  This is simply further evidence that a market shift was foreseeable prior to the parties' agreement [in December of 2003]."  *Id.* at *10.).  As previously noted, the parties in this action entered into the contract at issue precisely

documentation to support its contention that the steel shortage that allegedly made GranTurk's performance impracticable was unforeseeable.  *See Jennings v. Univ. of N.C., at Chapel Hill*, 444 F.3d 255, 266 (4th Cir. 2006) ("The party seeking summary judgment has the initial burden to show absence of evidence to support the non-moving party's case.") (citing *Celotex,* 477 U.S. at 325).

Moreover, to the extent that G&H was unable to procure steel for the truck bodies due to the expense of purchasing steel, rising costs alone is not sufficient to invoke the defense of § 2-615.  Comment 4 to that section reads in relevant part:

> Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of performance.  Neither is a rise or a collapse in the market in itself a justification, for that is exactly the business risk which business contracts made at fixed prices are intended to cover.

MD CODE, COM. LAW § 2-615 comment 4.[13]  Any rising cost of steel during the time when the parties entered into their agreement, therefore, is not sufficient for an impracticability defense.

Defendant further contends that even if it foresaw the steel shortage, an exculpatory

---

during this time frame.

[13]       Comment 4 goes on to state that

> a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance is within the contemplation of this section.

MD CODE, COM. LAW § 2-615 comment 4.  GranTurk proffers that the alleged steel shortage was "precipitated by Chinese demand for steel . . . ."  (Def.'s Mem. Supp. Mot. Summ. J. p. 13.)  This statement is insufficient to be deemed one of the scenarios listed in comment 4.

clause in the contract at issue, stating "Delivery promised subject to delay beyond our control,"

excused GranTurk's delay.  (Def.'s Mem. Supp. Mot. Summ. J. p. 13.)  In order to overcome the

foreseeability issue, an exculpatory clause must "expressly transfer[] the risk to the purchaser."

*Rockland*, 1 F. Supp. 2d at 531.  This Court cannot conclude at this stage that the clause

"Delivery promised subject to delay beyond our control" expressly transfers to ESI the risk that

GranTurk's sole supplier will fail.[14]  As previously noted, ESI does not concede that GranTurk

has established that a steel shortage occurred, nor does it concede that GranTurk has established

that G&H was ever affected by any such shortage.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. p. 5-

6.)  GranTurk has provided no documentation of the steel shortage or its effect on G&H beyond

deposition testimony.  Therefore, GranTurk has failed to show that there are no genuine disputes

of material fact with respect to the second prong of the *Rockland* test.

Lastly, there are disputes of material fact regarding the third prong of the *Rockland*

test—the requirement that GranTurk employ "all due measures" to insure that G&H fulfilled its

obligation to provide the truck bodies.  GranTurk asserts that the conversations and meeting it

held with ESI and G&H "when it appeared that delivery would be delayed," along with its offer

to let ESI out of the agreement, demonstrate that GranTurk employed all due measures to insure

G&H supplied the truck bodies on time.  Although ESI does not directly address this point,

---

[14]     The Supreme Court of South Dakota in *Olson v. Spitzer*, 257 N.W.2d 459, (S.D. 1977), excused a supplier for failure to deliver based on the following clause in the contract at issue: "This order is subject to your ability to obtain such Equipment from the manufacturer and you shall be under no liability if delivery of the Equipment is delayed or prevented due to labor disturbances, transportation difficulties, or for any reason beyond your control."  *Id.* at 462.  In contrast to the exculpatory clause in *Olson*, the clause upon which GranTurk relies is far less specific.  Moreover, the facts surrounding the agreement at issue in this case leave disputed material facts with respect to the impact of this clause.

Plaintiff challenges that timely delivery of the trucks was made impracticable by a steel shortage, and, therefore, has not conceded that there was any contingency that required GranTurk's "due measures" to prevent.  (*See* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. p. 6.)  Given the lack of documentation supporting GranTurk's contention that a steel shortage precluded it from timely delivering trucks to ESI, this Court determines that genuine disputes of material facts exist on two of the prongs of the *Rockland* test and that GranTurk is, therefore, not entitled to summary judgment.

>    B.    Defendant's Assertion that it Did Not Agree to Penalty Payments Under the Contract

In this case, where summary judgment is requested based on the language in a written contract, the writing must be unambiguous for the court to grant summary judgment based solely on the agreement.  *See World-Wide Rights Limited Partnership v. Combe Inc.,* 955 F.2d 242 (4th Cir. 1992) ("Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence . . . .").  Therefore, the court must first determine whether the contract is ambiguous or unambiguous on its face.  *See id.* at 245.  A contract is ambiguous if "'susceptible of two reasonable interpretations.'"  *See id.* (quoting *American Fidelity & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965)).  "If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the judgment because no interpretive facts are in genuine issue."  *World-Wide Rights Limited Partnership*, 955 F.2d 245.  "Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if that evidence is, as a matter of law, dispositive of the interpretive issue, grant summary judgment on that basis."  *See id.* (citing *Jaftex Corp. v. Aetna Casualty and*

19

*Surety Co.,* 617 F.2d 1062, 1063 (4th Cir. 1980)).  However, if the extrinsic evidence in the summary judgment materials leaves genuine issues of fact in interpreting the contract, summary judgment is impermissible and the interpretation of the contract must be left to the trier of fact. *See World-Wide Rights Ltd. Partnership*, 955 F.2d at 245.  Indeed, "[t]he cardinal rule in construing contracts is to give effect to the intention of the contracting parties."  *DWS Holdings, Inc. v. Hyde Park Associates*, 33 Md. App. 667, 675, 365 A.2d 554, 559 (Md. Ct. Spec. App. 1976) (internal citation omitted).  In Maryland, the intention of the parties should be identified "from all the documents comprising the transaction."  *Id.* (internal citation omitted).

As noted *supra* in "Background," material disputes of fact exist as to what terms were included in the contract formed between ESI and GranTurk for the delivery of 12 garbage trucks with G&H bodies.  Most notably, it is disputed whether the e-mail discussing delivery dates and penalties was presented and incorporated, or otherwise attached to, the Order Form signed by the parties.  The deposition of Scott Schneider provides some insight into his recollection of the process leading up to the signing of the agreement, which he indicated as "probably [signed] on 12/1."  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. at Ex. 2, Dep. of Scott Schneider at 49:10-14.) However, even Schneider did not appear certain of his recollection of the events surrounding the formation of the contract.  Indeed, the Order Form itself contains only one date, November 25, 2003.  Therefore, the facts in this case would require this Court to weigh the evidence and make certain inferences to determine what terms the parties intended to be included in the contract. Such weighing of the evidence, determinations concerning witnesses' memories of events, and the judging of the credibility of witnesses are impermissible functions for the Court on summary judgment.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000)

(quoting *Anderson Liberty*, 477 U.S. 255) ("'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"); *see also Bright v. QSP, Inc.*, 20 F.3d 1300, 1309 (4th Cir. 1994) (recognizing that credibility of witnesses is an issue of fact to be determined by the jury).

Other extrinsic evidence at issue in this case also leaves genuine issues of fact in interpreting the contract between ESI and GranTurk.  The fax cover sheet dated December 1, 2003 from Schneider to ESI discussing the penalties GranTurk was committed to paying is ambiguous, as it could be read as pertaining to either ESI/GranTurk agreement.  Furthermore, as stated above, the disputed fact of when the Order Form was signed (e.g. November 28, 2002 or December 1, 2003) implicates whether this fax cover sheet could have been related to and/or attached to ESI/GranTurk contract for the G&H truck bodies.  (*See* Def.'s Mem. Supp. Mot. Summ. J. at Ex. 3.)  There are also interoffice memoranda and correspondence between the parties discussing penalties on garbage trucks with G&H truck bodies.  (*See* Def.'s Mem. Supp. Mot. Summ. J. at Exs. 15, 16, 17.)  These items of extrinsic evidence presented in the summary judgment materials leave genuine issues of fact in interpreting the contract at issue.  Therefore, this Court denies Defendant's Motion for Summary Judgment.  The interpretation of the parameters of this contract are to be determined by the trier of fact.  *See World-Wide Rights Ltd. Partnership*, 955 F.2d at 245.

    C.    <u>Defendant's Assertion that the Penalty for Late Delivery is an Unenforceable Penalty</u>

Defendant next argues that, even assuming it did agree to a late delivery fee, such a "penalty" is unenforceable under Maryland law.  Plaintiff contends that these delay damages are enforceable as liquidated damages.  The Maryland Court of Appeals has defined a liquidated

damages clause as "a specific sum of money . . . expressly stipulated by the parties to a  . . .

contract as the amount of damages to be recovered by either party for a breach of the agreement

by the other." *Mass. Indem. & Life Ins. v. Dresser,* 269 Md. 364, 368, 306 A.2d 213, 216 (Md.

1973).  Furthermore, Article § 2-718(1) of the Commercial Law Article provides:

> Damages for breach by either party may be liquidated in the
> agreement but only at an amount which is reasonable in the light of
> the anticipated or actual harm caused by the breach, the difficulties
> of proof of loss, and the inconvenience or nonfeasibility of
> otherwise obtaining an adequate remedy. A term fixing
> unreasonably large liquidated damages is void as a penalty.

Md. Code Ann., Com. Law §§ 2-718.  This provision is basically a codification of Maryland

common law.

In Maryland, there is a three part test for a court to apply to determine the validity of a

liquidated damage clause.  *See Holloway v. Faw, Casson & Co.*, 319 Md. 324, 354, 572 A.2d

510, 525 (Md. 1990) (citing *Massachusetts Indem. & Life Ins. Co. v. Dresser,* 269 Md. 364, 368-

69, 306 A.2d 213, 216 (Md. 1973)):

> First, such a clause must provide in clear and unambiguous terms
> for a certain sum.  Secondly, the liquidated damages must
> reasonably be compensation for the damages anticipated by the
> breach.  Thirdly, liquidated damage clauses are by their nature
> mandatory binding agreements before the fact which may not be
> altered to correspond to actual damages determined after the fact.

*See id.* (internal citations and quotations omitted) (finding a valid liquidated damages clause).

Under Maryland law, the determination of whether the amount specified is a penalty or

liquidated damages is to be determined *as of the time of execution of the contract*."  *See Board of*

*Educ. of Talbot County*, 392 Md. at 158, 896 A.2d at 353 (emphasis added).

Applying this test to the case *sub judice*, it is undisputed that the late delivery fee states

an amount of $100.  (*See* Def.'s Mem. Supp. Mot. Summ. J. at Exs. at 13 & 14.)  However, the

fax cover sheet, (Def.'s Mem. Supp. Mot. Summ. J. at Ex. at 13), states a damage amount of

$100 per day, per truck.  The e-mail, (*See* Def.'s Mem. Supp. Mot. Summ. J. at Ex. at 14), does

not contain the "per truck" language and simply states: "We will stand behind a $100 per day

late penalty clause."  It is a question of law whether a contract provision is an impermissible

penalty or liquidated damages.  *See Board of Educ. of Talbot County v. Heister*, 392 Md. 140,

155, 896 A.2d 342, 351 (Md. 2006).  One of the main factual disputes in this case is which

document -- the fax or the e-mail-- (or neither) is part of the contract at issue.  While this Court

is not deciding which document, if either, is part of the contract at issue between ESI and

GranTurk, since, as noted above, this determination is for the fact finder, this Court does find

that both documents contain a "certain sum" that satisfies the first prong of the liquidated

damages test.

     Second, both the fax and the e-mail contain an amount that is reasonable in the light of

the anticipated harm that would be caused by a breach.  The exact amount of money it would

take ESI to rent substitute garbage trucks, or pay employees overtime to complete its contract

obligations to Montgomery County with the trucks it had, is difficult to ascertain.  Unlike renting

a normal vehicle, Plaintiff's submissions illustrate that there is not a ready-market for garbage

truck rentals and those in the industry look to competitors to supply temporary trucks for rent.

The amount of $100 per day, per truck does not seem excessive and, certainly, then an amount of

$100 per day is also reasonable and not excessive.

     This Court's analysis of the third factor utilized to determine the validity of a liquidated

damages clause also implicates, Count IV, which is more specifically addressed below.  In

examining the third factor this Court must determine whether the liquidated damages clause is a mandatory binding agreement before the fact which may not be altered to correspond to actual damages determined after the fact.  Defendant highlights that Plaintiff's request for actual damages (in Count IV) in the amount of interest and finance charge damages on the late trucks illustrates that the $100 fee is a penalty.  Plaintiff, however, is not trying to alter the provisions of the liquidated damage amount to account for its actual damages.  Instead, Plaintiff, in Count IV, is trying to tack on additional damages to the liquidated damages.  Therefore, this Court is not persuaded by Defendant's contention that the $100 per day or $100 per day, per truck is an improper penalty simply because Plaintiff now seeks additional compensatory damages. Therefore, Defendant's Motion for Summary Judgment is denied as to Count II (Delay Damages Against GranTurk).

         D.      <u>Count IV - Compensatory Damages for Breach of Contract</u>

Plaintiff also seeks compensatory damages in this case for expenses it allegedly incurred in the form of interest and finance charges paid after May 15, 2004 (the latest alleged delivery date) until the last three trucks were delivered in September 2004.  The parties, as discussed above, dispute whether the delivery dates, outlined in either the fax or e-mail, were in fact enforceable as part of the written contract at issue.  As previously noted, the Order Form itself contains no mention of delivery dates or late delivery penalties.  If the finder of fact was to determine that neither the fax nor e-mail were part of the contract in this case, Plaintiff would not be entitled to recover the liquidated damages requested in Count II or the compensatory damages requested in Count IV.  However, if Plaintiff prevails at trial, it seeks to recover both liquidated damages and compensatory damages.  As Defendant correctly notes, this is impermissible as a

matter of law.

The Maryland Court of Appeals in *Blood v. Gibbons*, 288 Md. 268, 274, 418 A.2d 213, 217 (Md. 1980) has recognized that if a plaintiff receives liquidated damages, then a claim may not be made for actual damages. *See id.* (citing *Macon v. Zeiler*, 233 Md. 160, 164, 195 A.2d 687, 689 (Md. 1963); *Alois v. Waldman*, 219 Md. 369, 377, 149 A.2d 406, 411 (Md. 1959)). This Court has already determined that there is a valid liquidated damages clause in this case, should the fact finder determine that the clause was part of the contract. If a contract provides for liquidated damages for failure to perform, proof of actual damages is precluded, since the intent of such forfeiture provision is to make it unnecessary for the parties to ascertain actual damages. *Blood*, 288 Md. at 273-74, 418 A.2d at 216-17.[15] As a result, if the fact finder finds that either document containing the liquidated damages clause is part of the contract, Plaintiff cannot collect its claimed compensatory damages in this case, such as its interest and finance charges paid during the time period when the trucks were late, as such damages are subsumed by the liquidated damages clause. Therefore, Defendant's Motion for Summary Judgment is granted as to Count IV of Plaintiff's Complaint.

## CONCLUSION

For the reasons stated above, GranTurk's Motion to Dismiss is DENIED and GranTurk's

---

[15]     As the Maryland Court of Special Appeals has noted, " . . . there must be an election of remedies and . . . the injured parties cannot be permitted to make the choice between liquidated and actual damages after they have determined which are the greater; for the intent of the option clause is not to give them that advantage, but to make it unnecessary for them to ascertain actual damages." *Sampson v. McAdoo*, 47 Md. App. 602, 606, 425 A.2d 1, 3 (Md. Ct. Spec. App. 1981) (internal citation and quotation omitted).

Motion for Summary Judgment is GRANTED in part and DENIED in part.  A separate Order

will follow.


Dated: August 9, 2006                           /s/_____
                                                Richard D. Bennett
                                                United States District Judge